**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jose A Vega, | No. CV-20-00284-TUC-RCC |
| Plaintiff, | **ORDER** |
| v. | |
| All My Sons Business Development LLC, et al., | |
| Defendants. | |

Pending before the Court are Plaintiff Jose A. Vega's Motion for FLSA Conditional Class Certification (Doc. 47), Motion for Rule 23 Class Action Certification (Doc. 54), and Motion to Strike (Doc. 84). Also pending is Defendants All My Sons Business Development LLC, All My Sons Moving & Storage of Tucson LLC, and All My Sons Moving & Storage of Phoenix LLC's (collectively "All My Sons") Motion for Judgment on the Pleadings on Plaintiff's Paid Sick Time Claims. (Doc. 69.) The matters have been fully briefed. (Docs. 47, 54, 62, 69–71, 75, 77–78, 80, 83–84, 87–88.)

## I.    Background

On July 2, 2020, Vega filed a collective action and class action complaint on behalf of himself and others similarly situated against All My Sons for violating the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–19 (Counts I, II); state wage laws, Arizona Revised Statutes ("A.R.S.") §§ 23-363–65 (Count III) and A.R.S. §§ 23-350–62 (Count IV); and state paid sick time laws, A.R.S. §§ 23-371–81 (Count V). (Doc. 1.) In summary, Vega alleges that All My Sons fail to pay helpers minimum wage for all hours worked by requiring them to perform duties that do not count towards their hourly pay.

(*Id.*) He further alleges that All My Sons fail to pay time and a half for overtime hours worked. (*Id.*) Lastly, Vega alleges that All My Sons fail to provide notice of accrued paid sick time. (*Id.*) As a result, employees remain unaware when they have earned paid sick time, which Vega asserts entitles them to civil penalties. (*Id.*)

All My Sons do business as a nationwide moving company with locations in Phoenix and Tucson. (*Id.* at 3–4, 9; Doc. 62 at 2.) All My Sons Tucson operates out of a local dispatch center. (Doc. 47 at 4.) In May 2020, All My Sons Tucson hired Vega to work as a "helper," assisting drivers with moves by loading and unloading customer property. (*Id.*; Doc. 62 at 2.) Vega worked for All My Sons Tucson until July 2020. (Doc. 47 at 4.)

## II.    FLSA Conditional Certification

On March 16, 2021, Vega moved to conditionally certify a collective action pursuant to § 216(b) of the FLSA. The potential opt-in plaintiffs include approximately 200 current and former helpers who worked at All My Sons Tucson during the statutory period. (*Id.* at 2.) According to Vega, helpers employed between July 2, 2017 and the present are eligible to opt in to the collective action. (*Id.*) The collective would seek to recover all unpaid wages owed under the FLSA, including minimum and overtime wages. (*Id.*)

Vega argues that helpers at All My Sons Tucson are similarly situated because they perform the same tasks pursuant to the same written compensation policies, including the All My Sons Employee Handbook and Payroll Policy. (*Id.* at 4, 8, 11.) He also underscores that helpers go through the same hiring and training process. (*Id.* at 4, 8.) At All My Sons Tucson, helpers also work under the same local management—Ricky Yarbrough, General Manager, and Jayson Nevins, Assistant Manager. (*Id.* at 8; Doc. 60 at 19.) Yarbrough took over operations at All My Sons Tucson halfway through Vega's employment in June 2020. (Doc. 60 at 71.)

All My Sons pay helpers each week based on an hourly rate, nondiscretionary bonuses, and tips. (*Id.* at 35, 48.) Vega's hourly rate was $12. (Doc. 1 at 9.) The All My Sons Payroll Policy looks at work "performed for and billed to a customer, and [is] not

based strictly on hours worked." (Doc. 47-4 at 7.) It states,

> Instead of setting an hourly rate at minimum wage and paying from the time [helpers] arrive at [the] All My Sons facility in the morning until the time [helpers] leave at the end of the day, [their] total pay is set above minimum wage. Subject to applicable regulations, not all time [helpers] are in the vehicle is considered working time . . . . [The] '[c]lock starts' when you arrive at the customer location and obtain the customer's initials next to the start time. The 'clock stops' when you finish the move at the customer's new location and obtain the customer's initials next to stop time.

(*Id.*) The Payroll Policy further dictates that "[h]elpers will be paid an additional 30 minutes for travel time for the day, per job performed." (*Id.*) Yarbrough and Nevins track hours for All My Sons Tucson using the Client Management System. (Doc. 60 at 58.) A member of the crew calls the dispatch center to notify management about start and stop times as well as any unpaid breaks the crew takes. (*Id.* at 57–58.)

According to Vega, the Payroll Policy results in helpers working various unpaid hours each week. (Doc. 1 at 6; Doc. 47 at 5–6.) He alleges that helpers are required to arrive at the dispatch center each morning to perform preliminary tasks including picking up the tablet, loading the truck with packing supplies, and filling up the gas tank. (Doc. 1 at 9; Doc. 71 at 2.) The crew, consisting of helpers and a driver, then travel to the first customer job site where they must conduct a walkthrough before the customer initials the paperwork to mark the official start time. (Doc. 1 at 9–10; Doc. 71 at 3.) Vega also asserts that helpers often work through their unpaid lunch hour and attend mandatory trainings for which they are not compensated. (Doc. 1 at 12; Doc. 71 at 3.) In total, Vega maintains that All My Sons do not compensate helpers for: (1) hours worked at the dispatch center, (2) travel time to the first customer job site, (3) travel time between job sites, (4) travel time returning to the dispatch center at the end of the day, and (5) work performed at job sites off the clock. (Doc. 47 at 6.)

Vega estimates that he worked approximately two and a half hours per day performing required tasks for which All My Sons did not pay him. (*Id.*) For example, in

one illustrative week, he alleges that he worked 40 hours but All My Sons only paid him for 24 hours at his $12 hourly rate. (*Id.* at 7; Doc. 1 at 11.) This means that Vega earned $7.20 an hour for 40 hours worked. Therefore, Vega argues that his total hours worked versus the hours for which All My Sons paid him demonstrate that helpers earn less than the minimum wage required by the FLSA. (Doc. 1 at 11.)

He also alleges that All My Sons does not pay overtime wages at a rate of time and a half when helpers work more than 40 hours a week. (*Id.* at 12.) For example, Vega states that he worked 60 hours in one week, but his paystub shows that he was only paid for 45.75 hours at his normal $12 hourly rate. (Doc. 47 at 7.)

In response, All My Sons argue that Vega cannot meet his burden to conditionally certify an FLSA collective action because his personal claims lack merit, and he has no knowledge of how All My Sons compensate other helpers. (*See generally* Doc. 62.)

First, All My Sons contend that helpers are exempt from the relevant minimum wage and overtime provisions of the FLSA by the Motor Carrier Act ("MCA"). (*Id.* at 8.) All My Sons emphasize that the Payroll Policy states, "the work and hours of Drivers and Helpers are governed by the 'Motor Carrier Act' which allows motor carriers to have pay plans that are not tied to total hours, such as paying by the mile or load." (*Id.* at 3.) Thus, All My Sons claim that the only relevant question is whether Vega was paid at least the federal minimum wage of $7.25 an hour. (*Id.* at 5–6.) They assert that All My Sons have never paid Vega or any helper less than $7.25 an hour. (*Id.* at 6, 18.)

Second, All My Sons argue that All My Sons Tucson does not strictly follow the written Payroll Policy. (*Id.* at 4.) Yarbrough claims that he routinely pays more than the 30-minute travel time outlined in the Payroll Policy because he "adds time based on the time the Helpers leave the [dispatch center in] Tucson in the morning and the time they return." (*Id.*) The actual travel time is tracked either by electronic log in the company-owned trucks or by information provided by the crew if they are using a rental truck. (Doc. 60 at 68.) All My Sons stress that Vega acknowledged he had been paid for more than 30 minutes of travel time "[o]nce or twice." (Doc. 62 at 11; Doc. 62-1 at 14.)

All My Sons also assert that helpers in Tucson are sometimes paid for travel time

they do not actually travel. (Doc. 62 at 4.) According to Yarbrough, helpers are not required to arrive at the dispatch center in the morning despite Vega's assertions. (*Id.*) He states that drivers frequently pick helpers up on the way to the first job site in the company truck because many helpers do not own cars. (*Id.*) The helpers are nonetheless compensated for the travel time as if they had left from the dispatch center. (*Id.*) Yarbrough also asserts that helpers who do arrive at the dispatch center in the morning do not have work to perform before leaving on their first job because the managers prepare the trucks ahead of time. (*Id.*) According to Yarbrough, All My Sons Tucson goes so far as to compensate helpers for hours they do not actually work because he pays helpers a two-hour minimum per move even if the move takes less than two hours. (*Id.* at 5.)

Finally, All My Sons urge the Court to apply a higher standard when considering whether to conditionally certify this collective action because Vega and two All My Sons managers have already been deposed. (*Id.* at 6.)

### A. Standard of Review

The FLSA sets minimum wage at $7.25 an hour. 29 U.S.C. § 206(a)(1)(C). It also requires employers to pay employees at one and a half times their regular hourly rate for overtime hours worked. 29 U.S.C. § 207.

Under the FLSA, an employee may bring a collective action to enforce the statutory minimum wage and overtime provisions on behalf of himself and other employees who are "similarly situated" and who consent to participate in the action. 29 U.S.C. § 216(b); *see also Campbell v. City of Los Angeles*, 903 F.3d 1090, 1100 (9th Cir. 2018). The Ninth Circuit follows a two-step certification process in FLSA collective actions. *Campbell*, 903 F.3d at 1110. The first step requires a showing that the collective is similarly situated. *See id.* at 1109. "If the collective is similarly situated, the 'sole consequence' is 'the sending of court-approved written notice' to workers who may wish to join the suit." *Cabanillas v. 4716 Inc.*, No. CV-20-00894-PHX-MTL, 2021 WL 3773765, at *6 (D. Ariz. Aug. 25, 2021) (quoting *id.* at 1101)).

While the plaintiff bears the burden of demonstrating the collective is similarly situated, the standard for doing so is "lenient." *See Campbell*, 903 F.3d at 1109; *Villareal*

*v. Caremark LLC*, No. CV-14-00652-PHX-DJH, 2014 WL 4247730, at \*3 (D. Ariz. Aug. 21, 2014). In the Ninth Circuit, employees "are similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims." *Campbell*, 903 F.3d at 1117. The court does not resolve in-depth factual disputes or decide substantive issues when determining whether to conditionally certify a collective action; "the court 'requires nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan.'" *Barrera v. US Airways Grp., Inc.*, No. CV-2012-02278-PHX-BSB, 2013 WL 4654567, at \*3, 5 (D. Ariz. Aug. 30, 2013) (quoting *Wood v. TriVita, Inc.*, No. CV-08-0765-PHX-SRB, 2009 WL 2046048, at \*3 (D. Ariz. Jan. 22, 2009)).

While a plaintiff seeking conditional certification typically presents declarations or affidavits from potential opt-in plaintiffs to demonstrate similarity, such documents are not required. *Hart v. U.S. Bank NA*, 2013 WL 5965637, at \*4 (D. Ariz. Nov. 8, 2013). Rather, "a defendant's internal documents and deposition testimony from a defendant's corporate representatives" may constitute sufficient evidence because they "carry at least as much evidentiary weight as declarations or affidavits from interested, opt-in plaintiffs." *Id.*

Furthermore, "[t]he potential applicability of a FLSA exemption . . . does not preclude conditional certification at step one; it is relevant at step two of the two-step approach." *Coyle v. Flowers Foods Inc.*, No. CV-15-01372-PHX-DLR, 2016 WL 4529872, at \*6 (D. Ariz. Aug. 30, 2016) (declining to consider defendant's argument that the MCA exemption precludes certification). Neither does the fact that discovery has progressed mean that higher scrutiny is required at the notice stage. *Shoults v. G4S Secure Sols. (USA) Inc.*, No. CV-19-02408-PHX-GMS, 2020 WL 8674000, at \*2 (D. Ariz. Jul. 31, 2020) (rejecting defendant's argument that the court should apply higher scrutiny to conditional certification because the parties had engaged in "extensive fact discovery" including Rule 30(b)(6) depositions).

## B. Analysis

Here, the Court finds that Vega has met his burden to conditionally certify a

collective action under the FLSA by demonstrating that helpers at All My Sons Tucson are similarly situated. Although Vega only briefly worked for All My Sons Tucson, his allegations, along with Yarbrough's testimony, establish that helpers perform the same work and earn wages in the same manner, either because All My Sons pay them pursuant to the corporate policies in the Employee Handbook and Payroll Policy, or because they are subject to the same unwritten local compensation policies. In other words, if Vega was undercompensated, then so too were other helpers at All My Sons Tucson. The determination of which precise policy applies and in what manner is an in-depth factual dispute that the Court will not resolve at the certification stage. Similarly, at this point, the Court will not consider the applicability of the MCA exemption.

Because All My Sons' compensation policies are at the heart of Vega's FLSA claims, individuals employed as helpers at All My Sons Tucson within the statute of limitations period share a similar material issue of fact. Accordingly, the Court will conditionally certify Counts I and II as a collective action under the FLSA.

### III.    FLSA Statute of Limitations

Although the Court will conditionally certify a collective of helpers at All My Sons Tucson, it is not currently in a position to specifically define eligible employment dates for that collective. Neither party has submitted sufficient briefing for this Court to determine (1) the precise cut-off date for the statute of limitations; and (2) the applicable statute of limitations.

In his Motion for FLSA Conditional Certification, Vega defines the collective to include any individual employed as a helper at All My Sons Tucson "from July 2, 2017 to the present." (Doc. 47 at 2.) It remains unclear whether "the present" now refers to the date of this Order or the date Vega moved for certification on March 16, 2020. The Court must clarify the appropriate cut-off date to be able to define the collective.

To further complicate matters, the Court previously granted Vega's request to toll his FLSA claims through September 2, 2020 (Doc. 12), but Vega made no such request to toll his claims while the Court considered the present motion. He does argue that notice must be expedited because "[t]he statute of limitations on the claims of potential

plaintiffs continues to run until each individual files a written consent to join the action as a party plaintiff." (Doc. 47 at 14.) However, the Court does not view this as a request to toll his claims, especially given that Vega also states that "courts have tolled the statute of limitations during the pendency of a decision for conditional certification for equitable reasons *and Vega reserves the right to seek tolling.*" (*Id.* (emphasis added).)

In addition, the Court does not have sufficient information to determine whether a two-year or three-year statute of limitations applies to Vega's FLSA claims. Generally, a two-year statute of limitations applies to FLSA claims. 29 U.S.C. § 255(a). However, "a cause of action arising out of a *willful violation* may be commenced within three years after the cause of action accrued." *Id.* (emphasis added). An employer willfully violates the FLSA if "the employer 'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA.'" *Flores v. City of San Gabriel*, 824 F.3d 890, 906 (9th Cir. 2016) (quoting *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 918 (9th Cir. 2003)). A court will not assume the employer's conduct was willful without specific evidence of a knowing violation or a reckless disregard for compliance. *See id.*

Vega seeks to apply a three-year statute of limitations, but he does not specifically argue that All My Sons willfully violated the FLSA, nor does he present any evidence to that effect. (Doc. 47 at 2–3.) Neither do All My Sons make any argument regarding the applicable statute of limitations. (*See* Doc. 62.)

To resolve this narrow issue and the related open questions described in Section VIII below, the Court will set oral argument for **Tuesday, March 8, 2022, from 11:00 a.m. to 11:30 a.m.** Following oral argument, the Court will issue a separate order defining the FLSA collective.

### IV.    FLSA Collective Action Notice

Vega also seeks approval of his proposed Notice (Doc. 47-1) and Consent to Opt-In to Lawsuit (Doc. 47-2). He requests authorization to send notice to potential opt-in plaintiffs via first-class mail, email, and text message. (Doc. 47 at 2.) Vega asks to expedite this process by requiring All My Sons to disclose the names and contact information of all potential opt-in plaintiffs within 10 days. (*Id.*) He proposes that

- 8 -

plaintiffs who choose to opt-in must file their consent forms no later than 90 days from the date notice is mailed. (*Id.* at 16.)

All My Sons vehemently oppose conditional certification of the FLSA collective but have not raised any objection or made any argument regarding the proposed Notice and Consent to Opt-In to Lawsuit. The Court, however, is not satisfied that this gap exists because All My Sons have no such objections. Therefore, the parties will be required to meet and confer to produce a joint Proposed Notice of Collective Action Lawsuit and Consent to Opt-In to Lawsuit. If, after good faith efforts, the parties cannot reach an agreement on the content of these documents, they must file a notice stating the issues remaining to be resolved.

Once finalized, Vega is authorized to send the Notice of Collective Action Lawsuit and Consent to Opt-In to Lawsuit to potential opt-in plaintiffs via simultaneous first-class mail, email, and text message. *Shoults*, 2020 WL 8674000, at *3–4 (emphasizing a district court's discretion to facilitate notice to potential collective action plaintiffs and approving notice by mail, email, and text message). Any opt-in plaintiffs who choose to participate shall file their consents no later than 90 days from the date notice is sent. *Id.* at *4 (permitting a 90-day deadline to file consent forms).

Moreover, the Court finds that 10 days is a reasonable time period in which to require All My Sons to provide Vega with the names and contact information of all potential opt-in plaintiffs. *See id.* (rejecting a 10-day deadline because the proposed class included "thousands of current and former employees"). All My Sons suggest that this information should be easy to access via their online payroll system. (Doc. 60 at 33–34.) Therefore, All My Sons shall produce to Vega, within 10 days of the date that the Court approves the Notice of Collective Action Lawsuit and Consent to Opt-In to Lawsuit, a computer-readable data file containing the names, last known mailing addresses, last known email addresses, last known phone numbers, and dates of employment for all potential members of the collective action.

## V.    Motion to Strike

On June 16, 2021, Vega filed a Notice of Supplemental Authority relevant to All

My Sons' Motion for Judgment on the Pleadings following the Ninth Circuit's decision in *Magadia v. Wal-Mart Associates, Inc.*, 999 F.3d 668 (9th Cir. 2021). (Doc. 80.)

All My Sons filed a response first asserting that *Magadia* has no bearing on this case because Vega never alleged that he, like the plaintiffs in *Magadia*, lacked access to itemized wage information. (Doc. 83 at 2.) For what appears to be the first time in this litigation, All My Sons contend that they complied with A.R.S. § 23-375(C) because they provided the required paid sick time information electronically via an online self-service account that employees including Vega can log into. (*Id.* at 2.) This system, All My Sons assert, constitutes an "employee's regular paycheck" within the meaning of the statute. (*Id.*) All My Sons attached a new sworn declaration from Yarbrough attesting to this information as well as a screenshot of the online accounts for Vega and other redacted employees. (Doc. 83-1.) Second, All My Sons argue that the California statutes at issue in *Magadia* are not equivalent to A.R.S. § 23-364(F) because the California statutes unmistakably provide for a private right of action to recover civil penalties while § 23-364(F) does not. (Doc. 83 at 2–3.)

Vega then moved to strike All My Sons' response pursuant to Local Rule 7.2(m)(1). (Doc. 84.) Vega asserts that All My Sons "used their extended time[1] to collect new evidence to support the new arguments they attempt to advance in their defense of the paid sick time at issue in their Motion for Judgment on the Pleadings." (*Id.* at 3.) According to Vega, All My Sons improperly used their response to his Notice of Supplemental Authority to "rewrite" their reply to the Motion for Judgment on the Pleadings, "now argu[ing] that Plaintiff actually had access to the requisite information electronically" and attaching proof of this assertion. (*Id.*) Alternatively, Vega asks permission to rebut these new arguments against his paid sick time claims should the Court not strike All My Sons' response to his Notice of Supplemental Authority. (*Id.*)

All My Sons responded to the Motion to Strike, arguing that Vega's Notice of Supplemental Authority itself was improper because, rather than provide a simple case

---

[1] The Court granted a request from All My Sons for a 14-day extension of time to submit a response to Vega's Notice of Supplemental Authority. (Doc. 82).

citation, it included "a full page analyzing the case and its purported application to the pending Motion for Judgment on the Pleadings." (Doc. 87 at 1.) Thus, All My Sons' response was solely to "rebut" Vega's improper argument. (*Id.* at 1–2.) All My Sons also take issue with Vega's Motion to Strike because, they assert, it inappropriately makes argument against All My Sons' response to the Notice of Supplemental Authority while simultaneously asking for leave to submit additional argument. (*Id.* at 2.)

### A. Standard of Review

Local Rule 7.2(m) provides that a "motion to strike may be filed only . . . if it seeks to strike any part of a filing or submission on the ground that it is prohibited (or not authorized) by a statute, rule, or court order." LRCiv. 7.2(m)(1). There is no local rule or Federal Rule of Civil Procedure governing a Notice of Supplemental Authority. However, in this district, "[t]he purpose of a Notice of Supplemental Authority is to inform the Court of a newly decided case that is relevant to the dispute before it; it is not a venue for submission of additional argument or factual evidence." *Myers v. Freed*, No. CV-19-05683-PHX-SMB, 2020 WL 6048327, at *1 (D. Ariz. Oct. 13, 2020) (striking as improper a Notice of Supplemental Authority that contained no new judicial opinion for the court to consider but included factual assertions outside the pleadings); *see also B Street Grill & Bar LLC v. Cincinnati Ins. Co.*, 525 F. Supp. 3d 1008, 1013 (D. Ariz. 2021) (striking as improper both parties' notices of supplemental authority but agreeing to consider the cited cases); *Doe v. Blue Cross Blue Shield of Illinois*, 492 F. Supp. 3d 970, 980 (D. Ariz. 2020) (striking as improper a notice of supplemental authority that "explain[ed] and argue[d] the case in detail" by applying the holding to the facts of the case).

### B. Analysis

Here, the Court does not believe that Vega's Notice of Supplemental Authority contains any argument. It is merely an accurate summary of *Magadia*'s relevant holding. Although it would have been simpler if Vega had submitted nothing more than a citation, nowhere in the one-page summary does Vega apply *Magadia* to the facts of the instant case or even summarize the Ninth Circuit's holding in an improperly persuasive manner.

Thus, not even the interests of fairness entitled All My Sons to offer rebuttal argument in response to a case summary by contrasting the facts of *Magadia* with the facts of this case.

Furthermore, All My Sons went beyond making improper rebuttal argument regarding the application of *Magadia*. All My Sons used their response to present new evidence and an entirely new factual argument in support of their Motion for Judgment on the Pleadings on Plaintiff's Paid Sick Time Claims, which had already been fully briefed. This is wholly impermissible. All My Sons do not address or attempt to explain what proper basis they had for presenting a new argument or submitting new evidence other than to point the finger at Vega as the first transgressor.

Therefore, the Court will consider the Ninth Circuit's holding in *Magadia* to the extent it is relevant to assessing All My Sons' Motion for Judgment on the Pleadings. However, the Court will disregard any overt application of *Magadia* raised by All My Sons. The Court will also disregard All My Sons' new assertion that Vega had access to the information required by § 23-375(C) via an online system that equates to a regular paycheck. Accordingly, Vega's Motion to Strike Defendants' Response to Plaintiff's Notice of Supplemental Authority is granted.

## VI.    Motion for Judgment on the Pleadings

On April 15, 2021, All My Sons moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) regarding Vega's paid sick time claims. (Doc. 69.) All My Sons assert that Vega has not stated a valid claim under A.R.S. §§ 23-372–73 and that he is not entitled to civil penalties under A.R.S. § 23-375(E) of the Fair Wages and Healthy Families Act ("Healthy Families Act"). (*Id.* at 2.) They argue that there is no private cause of action for an employee to recover "civil penalties" based on an employer's violation of the notice and recordkeeping requirements of A.R.S. §§ 23-375(A), (C). (*Id.* at 4–5.)

According to All My Sons, the statute's text as well as state caselaw and the Arizona Administrative Code support the conclusion that employees cannot recover civil penalties for notice violations pursuant to § 23-375(E) without an order from the

Industrial Commission of Arizona ("ICA"). (*Id.* at 6.) Although no appellate court in Arizona has yet to answer this question, All My Sons highlight two portions of the statute's enforcement provision in A.R.S. § 23-364. (*Id.* at 8.) First, § 23-364(A) states, "The [ICA] is authorized to enforce and implement this article and may promulgate regulations consistent with this article to do so." A.R.S. § 23-364(A). Second, § 23-364(G), states, "Civil penalties shall be retained by the agency that recovered them and used to finance activities to enforce this article." *Id.* § 23-364(G). All My Sons also rely on the Arizona Supreme Court's decision in *Arizona Chamber of Commerce & Industry v. Kiley*, 399 P.3d 80 (Ariz. 2017) and a Pima County Superior Court minute entry in *Olson v. Lemos*, No. C20193759 (Pima Cty. Super. Ct. July 31, 2020), to argue that there is no private right of action to recover civil penalties under § 23-375(C). (Doc. 69 at 8.) While the statute includes unambiguous language permitting an employee to recover paid sick time wages when their employer *fails to pay them*, All My Sons underscore that it does not provide equivalent language suggesting the employee can also recover civil penalties when their employer *fails to notify them* about earned paid sick time. (*Id.* at 10.)

Vega responds he has pled a cognizable claim that All My Sons "failed to provide the Helpers notice of their rights and their paid sick time available as required by Arizona law."[2] (Doc. 77 at 5.) He asserts that the statute's language and IAC guidelines clearly provide for a private right of action, as has this district in *Finton v. Cleveland Indians Baseball Company LLC*, No. CV-19-02319-PHX-MTL, 2021 WL 661975, at *11–12 (D. Ariz. Feb. 19, 2021), *order vacated in part on reconsideration on other grounds*, No. CV-19-02319-PHX-MTL, 2021 WL 1610199 (D. Ariz. Apr. 26, 2021). (*Id.*) If the Court declines to recognize a private right of action, Vega argues that "[s]uch a holding also would weaken Arizona's paid sick time law by eliminating a worker's incentive and financial ability to seek rectification when an employer violates the law." (*Id.* at 10–11.)

///

[2] Notably, "Vega is not pursuing claims for unpaid sick pay . . . ." (Doc. 75 at 5.) Rather, he seeks to recover civil penalties prescribed when an employer violates the notice and recordkeeping requirements under the paid sick time statute.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A. Standard of Review

A court may grant a motion for judgment on the pleadings if there is "no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Harris v. Ariz. Indep. Redistricting Comm'n*, 993 F. Supp. 2d 1042, 1063–64 (D. Ariz. 2014) (quoting *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009)). A motion for judgment on the pleadings is "functionally identical" to a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Randall v. Maxwell & Morgan, P.C.*, 321 F. Supp. 3d 978, 980 (D. Ariz. 2018) (quoting *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 n.4 (9th Cir. 2011)). The court "accepts all factual allegations in the complaint as true and construes them in the light most favorable to the non-moving party." *Fleming*, 581 F.3d at 925.

A district court interpreting state law is bound by a decision by the highest court in the state. *In re Kirkland*, 915 F.2d 1236, 1238 (9th Cir. 1990). However, "[i]n the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Id.* Furthermore, "'in the absence of convincing evidence that the highest court of the state would decide differently,' a federal court is obligated to follow the decisions of the state's intermediate courts. *Id.* (quoting *Am. Triticale, Inc. v. Nytco Servs., Inc.*, 664 F.2d 1136, 1143 (9th Cir. 1981)) (citation omitted).

### B. Analysis

Here, the Court will grant All My Sons' Motion for Judgment on the Pleadings because there is no private right of action that entitles Vega to recover § 23-364(F)'s civil penalties for violations of § 23-375(A) or § 23-375(C).

In Arizona, employers are required to provide two types of notice to employees regarding paid sick time. A.R.S. § 23-375(A), (C). First, § 23-375(A) requires employers to provide written notice of employees' rights to earn paid sick time. *Id.* § 23-375(A). Subsection (C) further dictates that "[t]he amount of earned paid sick time available to the employee, the amount of earned paid sick time taken by the employee to date in the

year and the amount of pay the employee has received as earned paid sick time shall be recorded in, or on an attachment to, the employee's regular paycheck." *Id.* § 23-375(C).

If an employer violates either of these notice requirements, they are "subject to a civil penalty according to section 23-364(F), Arizona Revised Statutes." *Id.* § 23-375(E). Under § 23-364(A), the ICA is "authorized to enforce and implement" the paid sick time provisions of Title 23. *Id.* § 23-364(A). Subsection (F) further states,

> Any employer who violates recordkeeping, posting, or other requirements that the commission may establish under this article shall be subject to a civil penalty of at least $250 dollars for a first violation, and at least $1000 dollars for each subsequent or willful violation and may, if the commission or court determines appropriate, be subject to special monitoring and inspections.

*Id.* § 23-364(F). Subsection (E) provides that "[a] civil action to enforce this article may be maintained in a court of competent jurisdiction by . . . any private party injured by a violation of this article." *Id.* § 23-364(E). But, notably, Section 23-364 goes on to specify:

> Any employer who fails to pay the wages or earned paid sick time required under this article shall be required *to pay the employee the balance of the wages or earned paid sick time owed* . . . . The commission and the courts shall have the authority to order payment of such unpaid wages, unpaid earned sick time, other amounts, and civil penalties and to order any other appropriate legal or equitable relief for violations of this article.  *Civil penalties shall be retained by the agency that recovered them and used to finance activities to enforce this article.*  A prevailing plaintiff shall be entitled to reasonable attorney's fees and costs of suit.

*Id.* § 23-364(G) (emphasis added). Altogether, the Court reads the statute's text to mean that an employee may bring a private action to recover unpaid sick time *wages*, but only the ICA can recover civil penalties, not the individual.

Furthermore, the Arizona Administrative Code states:

> Upon   determination   that   wages,   earned   paid   sick   time,

equivalent paid time off, or penalty payments are due and unpaid to any employee, the employee may, or the [Labor Department of the ICA] may on behalf of an employee, obtain judgment and execution, garnishment, attachment, or other available remedies for collection of unpaid wages and penalty payments established by a final Findings and Order of the [Labor Department of the ICA].

Ariz. Admin. Code. §§ 20-5-1218(A), 20-5-1202. Vega cites this language to argue that a court may award civil penalties in a civil action; however, a closer reading of the text underscores that the ICA, not the court, enforces the notice requirements through the imposition of civil penalties. Specifically, the section of the Arizona Administrative Code that Vega cites only authorizes a court to issue a judgment for civil penalties "established by" an order from the ICA. *Id.* § 20-5-1218(A). Section 20-5-2017 of the Arizona Administrative Code also specifies that "the [Labor Department of the ICA] may assess civil penalties" under A.R.S. § 23-364(F). *Id.* § 20-5-2017.

Neither the Arizona Supreme Court nor the Arizona Court of Appeals have determined whether an individual employee may recover the civil penalties contemplated by § 23-375(E) and § 23-364(F). However, the Court finds that the two decisions cited by All My Sons are instructive.

First, in *Kiley*, the Arizona Supreme Court looked at whether the Healthy Families Act violated the Arizona Constitution's Revenue Source Rule. 399 P.3d at 86. It asked whether the statute provided a funding source to help the ICA carry out its statutory mandate to issue regulations and "to 'coordinate implementation and enforcement' of earned paid sick time." *Id.* (quoting A.R.S. § 23-376). Ultimately, the Arizona Supreme Court held that the Healthy Families Act did not violate the Revenue Source Rule because § 23-364(G) "permit[s] the imposition of civil penalties on employers that fail to pay earned sick time to employees . . . . [and] provides that '[c]ivil penalties shall be retained by the agency that recovered them and used to finance activities to enforce this article.'" *Id.* (quoting A.R.S. § 23-364(G)).

Next, in *Olson*, Pima County Superior Court Judge Kellie Johnson granted a

- 16 -

motion to dismiss for failure to state a claim, finding that § 23-375 "does not provide a private cause of action for the recovery of civil penalties." (Doc. 69-1 at 2.) Although the minute entry did not offer any further explanation, the briefings before Judge Johnson offered arguments nearly identical to those now before this Court. (*See id.* at 4–18.)

The Court has also reviewed a recent decision from this district that Vega cites to argue § 23-375(C) allows an individual employee to recover civil penalties. In *Finton*, a district court denied the defendant-employer's motion for summary judgment on a § 23-375(C) recordkeeping claim finding that there was a dispute of material fact regarding whether the plaintiff had online access to the required paid sick time information. 2021 WL 661975, at *11–12. Although the district court permitted the § 23-375(C) claim for civil penalties to survive summary judgment, *Finton* is not determinative here because it never presented the question of whether the plaintiff had a valid claim to seek civil penalties under the statute.

In his separate Notice of Supplemental Authority, Vega also directs the Court's attention to *Magadia v. Wal-Mart Associates, Inc.*, 999 F.3d 668 (9th Cir. 2021). (Doc. 80.) In *Magadia*, the Ninth Circuit held that an employer's failure to provide accurate wage information on employees' regular paystubs is a cognizable injury because "without the mandated information, employees could not tell from their wage statements how the company calculated their wages or which dates the paystub covered—precisely the sort of 'real harm[]' that [the relevant California statute] is 'designed to prevent.'" 999 F.3d at 679–80.

The Court has reviewed the decision in *Magadia* and finds that the Ninth Circuit's reasoning is illustrative but not determinative in this matter. In *Magadia*, the Ninth Circuit was tasked with determining whether, for purposes of Article III standing, an employee suffers a cognizable injury if their employer violates a notice provision of California wage law. That is not the question now before this Court. Rather, this Court is faced with deciding whether A.R.S. §§ 23-375(A), (C), and (E) permit an individual employee to recover the "civil penalties" contemplated by A.R.S. § 23-364(F). The Court finds that they do not.

1       The Court is also not persuaded by Vega's public policy argument that this finding

2   will weaken enforcement of § 23-375's notice requirements because, as detailed above,

3   the statute specifically entrusted the ICA to enforce compliance with these requirements.

4   If an employee believes their employer has violated § 23-375 by failing to provide either

5   of the two types of notice required by the statute, they may file a complaint with the ICA

6   and seek enforcement through that mechanism.

7       Thus, because there is no private right of action to seek civil penalties for

8   violations of § 23-375(A) or (C), the Court will grant All My Sons' Motion for Judgment

9   on the Pleadings as to Vega's paid sick time claims.

10   **VII.   Dismissal of Defendant All My Sons Business Development, LLC**

11       In their Motion for Judgment on the Pleadings, All My Sons briefly argue that all

12   claims against Defendant All My Sons Business Development, LLC under the Arizona

13   Healthy Families Act should be dismissed. (Doc. 69 at 15.) The extent of their argument

14   is that the Healthy Families Act only applies to employers in Arizona and All My Sons

15   Business Development, LLC is a Texas company doing business in Texas. (*Id.*)

16       Vega responds that All My Sons Business Development, LLC is an "employer" as

17   defined by the paid sick time statute in A.R.S. § 23-371(G). (Doc. 77 at 18.) According to

18   Vega, All My Sons Business Development, LLC is the corporate headquarters that

19   "creates policies and human resources practices applicable to Vega and the Helpers in

20   Arizona . . . ." (*Id.*)

21       Because the Court will grant All My Sons' Motion for Judgment on the Pleadings,

22   any claims pursuant to the paid sick time provisions of the Healthy Families Act will be

23   dismissed as to all Defendants including All My Sons Business Development, LLC.

24   However, based on Vega's Complaint, the Court believes there are more allegations

25   against All My Sons Business Development, LLC than just the paid sick time violations.

26   (Doc. 1 at 13–20.) If Defendants seek to dismiss any remaining claims against All My

27   Sons Business Development, LLC, they must file a separate motion and fully brief that

28   argument. The single paragraph addressing this issue that All My Sons included in their

Motion for Judgment on the Pleadings does not give the Court sufficient information or

argument to assess whether All My Sons Business Development, LLC should be dismissed entirely.

## VIII.  Rule 23 Class Action

Additionally, Vega asks to certify two classes of All My Sons helpers under Federal Rule of Civil Procedure 23 with regard to his state law claims in Counts III, IV, and V. (Doc. 54 at 2.)

### A.  Standard of Review

A plaintiff seeking to certify a class bears the burden to demonstrate by a preponderance of the evidence that the proposed class action meets the four requirements of Rule 23(a) and falls within at least one of the categories of Rule 23(b). Fed. R. Civ. P. 23; *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011); *Valenzuela v. Ducey*, No. CV-16-03072-PHX-DGC, 2017 WL 6033737, at *3 (D. Ariz. 2017). The court must conduct "a rigorous analysis" when deciding whether to certify a class action. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). This often requires the court to engage with the merits of the underlying claims to the extent they are relevant to deciding whether the requirements of Rule 23 have been met. *See id.* at 351.

### i.      *Rule 23(a)*

Rule 23(a) requires the plaintiff to show "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

A proposed class that consists of at least 40 members normally satisfies the numerosity requirement. *Horton v. USAA Cas. Ins. Co.*, 266 F.R.D. 360, 365 (D. Ariz. 2009).

Second, to establish commonality, the plaintiff must present sufficient evidence that the class members' claims "depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of

each claim in one stroke." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (citing *Dukes*, 564 U.S. at 350). It is enough for the plaintiff to present evidence of "a single question of law or fact that resolves a central issue." *Castillo v. Bank of Am., NA*, 980 F.3d 723, 728 (9th Cir. 2020). However, "[i]f there is no evidence that the entire class was subject to the same allegedly [illegal] practice, there is no question common to the class." *Ellis*, 657 F.3d at 983; *see also Dukes*, 564 U.S. at 350 (holding employees did not meet the commonality requirement because they did not present sufficient evidence of a uniform policy or even a common thread that connected millions of decisions by managers who had been given broad individual discretion). The "common contention need not be one that will be answered, on the merits, in favor of the class." *Des Roches v. Cal. Physicians' Serv.*, 320 F.R.D. 486, 497 (N. D. Cal. 2017) (quoting *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1053 (9th Cir. 2015)).

Third, the named plaintiff must establish that his claims are typical of the class because "they are reasonably co-extensive with those of absent class members; [but] they need not be substantially identical." *Castillo*, 980 F.3d at 729 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)) (holding named plaintiff's claims were typical of the class because he was subject to the same compensation policy and his claims arose from that policy).

Finally, to show he is an adequate representative of the class, the plaintiff must demonstrate that he has no conflicts with the class and that he and his counsel can vigorously prosecute the action. *Ellis*, 657 F.3d at 985.

### ii.    *Rule 23(b)*

If the plaintiff satisfies all four requirements of Rule 23(a), the class action must also fall within at least one of Rule 23(b)'s categories. Fed. R. Civ. P. 23(b). The first category permits certification if:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
> > A. inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

opposing the class; or
B.  adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

*Id.*

The certification of a class under Rule 23(b)(1)(A) is not appropriate if the only risk of separate actions is that the opposing party will be liable to pay different amounts to different class members or even that the opposing party will be liable to some class members and not others. *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1193 (9th Cir. 2001); *see also McDonnell-Douglas Corp. v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 523 F.2d 1083, 1086 (9th Cir. 1975). Rather, the risk of "incompatible standards of conduct" required by Rule 23(b)(1)(A) occurs when "different results in separate actions would impair the opposing party's ability to pursue a uniform continuing course of conduct." *Zinser*, 253 F.3d at 1193 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1773 at 431 (2d ed. 1986)). Rule 23(b)(1)(A) is not meant for situations where separate actions simply raise the same question of law. *McDonnell-Douglas Corp.*, 523 F.2d at 1086. The Ninth Circuit has also held that certification is inappropriate under Rule 23(b)(1)(A) in actions that primarily seek monetary damages. *Zinser*, 253 F.3d at 1193.

Furthermore, Rule 23(b)(1)(B) is reserved for situations where "separate actions 'inescapably will alter the substance of the rights of others having similar claims.'" *McDonnell-Douglas Corp.*, 523 F.2d at 1086 (quoting *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 466–67 (9th Cir. 1973)). This situation does not exist where "[a]t worst, individual actions would leave unnamed members of the class with the same complexity and expense as if no prior actions had been brought." *Id.* Instead, Rule 23(b)(1)(B) best applies when multiple individuals seek relief from a limited fund and separate lawsuits risk draining the fund before meritorious claimants have had the opportunity to seek recovery. *See, e.g.*, *Daly v. Harris*, 209 F.R.D. 180, 191 (D. Haw. 2002) (citing *Zinser*, 253 F.3d at 1197).

Next, Rule 23(b)(2) permits certification under the second category of class actions if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2). However, "Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." *Ellis*, 657 F.3d at 986 (*quoting Zinser*, 253 F.3d at 1195). A former employee who is not seeking reinstatement generally lacks standing to bring a claim for injunctive or declaratory relief based on the company's employment practices. *See Dukes*, 564 U.S. at 365; *Walsh v. Nev. Dept. of Hum. Res.*, 417 F.3d 1033, 1037–38 (9th Cir. 2006). "Unless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief." *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) (holding that named plaintiffs could not bring a class action where the class sought only equitable relief because they lacked individual standing to pursue such relief); *see also Ellis*, 657 F.3d at 986–88 (vacating district court's certification of class action under Rule 23(b)(2) in part because named plaintiffs were former employees who lacked standing to seek injunctive or declaratory relief against former employer).

Lastly, Rule 23(b)(3) permits certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3)'s predominance requirement is more difficult to satisfy than mere commonality. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). However, "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *LaCross v. Knight Transp. Inc.*, No. CV-15-00990-PHX-JJT, 2022 WL 101196, at *4 (D. Ariz. Jan. 11, 2022) (quoting *Hanlon*, 150 F.3d at 1022). Moreover, if the employer-defendant's conduct gave rise to the alleged injury, individual calculations as to each employee's damages do not preclude a finding of predominance under Rule 23(b)(3). *Vaquero v. Ashley Furniture*

- 22 -

*Indus., Inc.*, 824 F.3d 1150, 1154–55 (9th Cir. 2016).

Before certifying a class pursuant to Rule 23(b)(3), the court must also consider the superiority factors. *LaCross*, 2022 WL 101196, at *6. These include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;
> (D) and the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). "A consideration of these factors requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *LaCross*, 2022 WL 101196, at *6 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1780 at 562 (2d ed. 1986)).

## B. Analysis

### i. Paid Sick Time Class

Vega first asks to certify a class of helpers at All My Sons Phoenix and Tucson who are entitled to earned paid sick time under Arizona law. (Doc. 54 at 2.) The Court will not address whether it may properly certify the Paid Sick Time Class because, as it previously concluded, the Court will grant Defendants' Motion for Judgment on the Pleadings on Plaintiff's Paid Sick Time Claims.

### ii. Unpaid Wages Class

Vega next seeks to certify an Unpaid Wages Class of helpers who worked at All My Sons Tucson from "July 2, 2017 to the present." (*Id.*) The Unpaid Wages Class would aim to recover unpaid and untimely wages owed pursuant to A.R.S. §§ 23-350–65. (*Id.* at 2–3.) Vega also seeks declaratory and injunctive relief that would require All My Sons to cease their allegedly illegal wage practices. (*Id.* at 3.)

In support of his motion, Vega reiterates that All My Sons Tucson requires helpers to perform the same duties, including work for which All My Sons does not compensate

them under the uniformly applicable Payroll Policy. (*See id.* at 5–6.) He maintains that the Unpaid Wages Class meets the four requirements of Rule 23(a) and qualifies for certification under all three categories of Rule 23(b). (*Id.* at 4.)

All My Sons disagree that Vega has established the Rule 23(a) requirements of commonality or adequate representation for the proposed Unpaid Wages Class. (Doc. 70 at 8–14.) Relying on the MCA, they urge against certifying the Unpaid Wages Class because helpers are not entitled to overtime pay under the FLSA. (*Id.* at 7–8.) Thus, state law never required All My Sons to timely pay overtime wages. (*See id.*) They also assert that Vega's claims for unpaid straight time fail because Vega assumes state law requires all pay plans to be at an hourly rate when the statutes actually allow for flexible pay plans. (*Id.* at 8.)

Furthermore, All My Sons argue that Vega, as a short-term employee, is not an adequate representative of the Unpaid Wages Class because he has no knowledge of how other helpers are compensated. (*Id.* at 8, 10, 13.) According to All My Sons, Vega has not spoken to any other helper regarding hours worked or hours owed, lacks information about any helper whose wages fell below minimum wage, and has no indication that anyone would be interested in joining the lawsuit. (*Id.* at 14.)

Finally, All My Sons contest certification under Rule 23(b)(3) because Vega has failed to establish that common questions predominate over individual matters. (*Id.* at 14–16.) They argue that Yarbrough, while manager in Tucson, added travel time in an "ad hoc" manner that makes this case "ill-suited for class treatment." (*Id.* at 3.) They emphasize that Vega "admitted" that his allegations regarding unpaid travel time are false. (*Id.*) Therefore, All My Sons reason that individual questions predominate because each class member would require a mini-trial to adjudicate whether and to what extent the time Yarbrough added was sufficient. (*Id.*)

For the following reasons, the Court will certify the Unpaid Wages Class to seek to recover unpaid and untimely wages owed pursuant to A.R.S. §§ 23-350–65.

### a.  *Rule 23(a) Discussion*

First, Vega has shown that the Unpaid Wages Class is numerous because he

offered evidence that there are potentially over 200 class members. His claims are also typical of the class because, over the course of approximately two months, Vega worked as a helper for All My Sons Tucson and his unpaid wage claims arise from compensation practices that applied to him as they apply to other helpers. Thus, his claims are "reasonably co-extensive" with other class members, even if those claims are not identical in terms of daily tasks performed or total hours worked.

Furthermore, the Court finds that there are questions of law and fact common to the Unpaid Wages Class whose resolution is central to the validity of the state wage claims. In Arizona, employers are required to timely pay wages. A.R.S. § 23-351(A). Section 350(7) defines wages as "nondiscretionary compensation due an employee in return for labor or services rendered by an employee for which the employee has a reasonable expectation to be paid whether determined by a time, task, piece, commission or other method of calculation." *Id.* § 23-350(7). The minimum wage in Arizona is $12 an hour, excluding tips. *Id.* §§ 23-350(5), 363(A)(4). "[I]f an employer . . . fails to pay wages due any employee, the employee may recover in a civil action against an employer or former employer an amount that is treble the amount of the unpaid wages." *Id.* § 23-355(A).

At this early stage in the litigation, there is sufficient evidence that helpers at All My Sons Tucson are compensated uniformly, whether that is because they are paid pursuant to the Payroll Policy or some unwritten local policy. It remains a question of fact whether All My Sons require helpers to perform unpaid labor and under which specific policy All My Sons Tucson pays its helpers. Regardless, it is All My Sons' uniform treatment of helpers that is the common thread.

The central question in this case is not how many additional hours each individual helper worked. That is a matter of damages should All My Sons be found liable for unpaid wages. Rather, the common question here is whether All My Sons' policies violate state law by failing to timely compensate helpers for overtime and by routinely requiring helpers to perform unpaid work thereby failing to pay them minimum wage. The Court will not resolve this key factual dispute at the certification stage, nor does it

Case 4:20-cv-00284-RCC   Document 93   Filed 02/01/22   Page 26 of 29


have sufficient evidence based on Vega's and Yarbrough's contrasting statements to further assess the merits of the unpaid wages claims.

Finally, Vega has satisfactorily established that he and his counsel can adequately represent the Unpaid Wages Class. There is no evidence that Vega has any conflicts with the other class members, and he has pursued these claims on behalf of all helpers from the outset of this litigation. Vega has also offered evidence of proposed class counsel's experience litigating class actions. The Court is satisfied with this information. The fact that Vega was a short-term employee who may not have specific knowledge about other helpers does not negate the uniform applicability of the policies his claims challenge. Moreover, Vega's admission that All My Sons paid him more than 30 minutes of travel time on more than one occasion does not make him an inadequate representative of the class because (1) the Unpaid Wages Class claims are not solely based on unpaid travel time, and (2) the number of unpaid hours worked is an individual question of damages. Therefore, Vega has met all four preliminary requirements for class certification under Rule 23(a).

### b.  Rule 23(b) Discussion

The Court finds that Vega has met the requirements for certification of the Unpaid Wages Class under only Rule 23(b)(3) because "questions of law or fact common to class members predominate . . ." and class certification is the best way to adjudicate these claims. Although predominance is a higher standard than mere commonality, Vega establishes that common questions eclipse any individual question of damages. Indeed, a single adjudication of whether All My Sons' compensation policies violate state wage laws would resolve a threshold question relevant to all plaintiffs before any individual calculation of damages would become necessary.

Vega has also demonstrated that a class action is a superior method of litigating these state wage claims against All My Sons. First, apart from the present lawsuit, the Court is not aware of any existing litigation against All My Sons based on allegations that All My Sons violate state wage laws by undercompensating helpers. Consequently, the Court does not have specific information regarding class members' interests in

controlling the prosecution of these claims in separate actions. However, the Court can imagine that the cost and complexity of pursuing these claims individually may be prohibitive for employees who earn, at the most, $16 an hour. Additionally, concentrating litigation in this forum is preferable because the Unpaid Wages Class is limited to approximately 200 people who worked in Tucson subject to Arizona wage laws. Finally, the Court does not anticipate difficulty managing the Unpaid Wages Class given that it is small in size, involves a narrow set of issues, and presents no conflict of laws. It is both more efficient and more economical to resolve any potential wage claims by helpers against All My Sons in this fashion, rather than to litigate hundreds of individual actions based upon the same pattern of conduct.

However, the Unpaid Wages Class is not suitable for certification under any other provision of Rule 23(b). Rule 23(b)(1)(A) cannot apply to the Unpaid Wages Class because the only risk that separate actions pose is the risk that All My Sons may be liable to only some helpers based on individual hours worked. This question of damages does not establish "incompatible standards of conduct."

Neither is the Unpaid Wages Class suitable for certification under Rule 23(b)(1)(B). There is no evidence that, should the claims succeed, All My Sons will draw an individual helper's recovery from a limited fund such that adjudication of one plaintiff's claims will "inescapably" affect the rights of others with similar claims. At worst, individual plaintiffs will be in the same position they were in before, faced with the ordinary difficulties and costs of individual litigation.

Likewise, Rule 23(b)(2) is not applicable to this action because the primary relief sought is not injunctive or declaratory; rather, it is monetary in the form of "unpaid minimum wages, unpaid straight time wages and unpaid overtime wages" that All My Sons owe helpers in return for labor they performed. As a former employee, Vega lacks standing to bring a class action under Rule 23(b)(2) for injunctive and declaratory relief against All My Sons.

### C. Defining the Unpaid Wages Class

Although the Court will certify the Unpaid Wages Class pursuant to Rule 23(b)(3),

it nonetheless faces a similar problem defining the Unpaid Wages Class as it does defining the FLSA collective. *See supra* Section III. Although Vega again marks July 2, 2017 as the start date for class eligibility, the Court remains unclear whether this start date is accurate and what cut-off date "the present" refers to.[3] Similarly, the Court requires clarification on the applicable statute of limitations for the Unpaid Wages Class. The Court will hear oral argument on the open questions regarding the Unpaid Wages Class in addition to those related to the FLSA collective. Following oral argument, the Court will issue a separate Order defining the Unpaid Wages Class's eligible employment dates.

## IX.    Conclusion

For the foregoing reasons, **IT IS ORDERED** that:

1. Plaintiff's Motion to Conditionally Certify FLSA Collective Action is **GRANTED**. (Doc. 47.) Pursuant to the procedure further outlined in Section IV of this Order, the parties will be required to meet and confer to produce a joint Proposed Notice of Collective Action Lawsuit and Consent to Opt-In to Lawsuit.

2. Plaintiff's Motion to Strike is **GRANTED**.  (Doc. 84.) Defendants' Response to Plaintiff's Notice of Supplemental Authority (Doc. 83) and accompanying documents shall be stricken from the record.

3. Defendants' Motion for Judgment on the Pleadings on Plaintiff's Paid Sick Time Claims Under the Arizona Healthy Families Act is **GRANTED**. (Doc. 69.) Count V of the Complaint is dismissed as to all Defendants.

4. Plaintiff's Motion for Rule 23 Class Action Certification is **GRANTED IN PART** and **DENIED IN PART**. (Doc. 54.) The Court will certify the Unpaid Wages Class to seek to recover unpaid and untimely wages to the extent they are owed pursuant to A.R.S. §§ 23-350–65. It will not certify the Paid Sick Time Class.

---

[3] Vega did not seek certification of the Unpaid Wages Class until March 26, 2021. (Doc. 54.)

1        5. As explained in Sections III and VIII of this Order, the Court will set oral

2        argument for **Tuesday, March 8, 2022, from 11:00 a.m. to 11:30 a.m.** for the

3        limited purpose of determining the applicable statutes of limitations and

4        eligibility dates for both the FLSA Collective Action and the Unpaid Wages

5        Class Action. The parties shall submit briefs of no longer than three (3) pages

6        on or before **Tuesday, March 1, 2022** summarizing their arguments on these

7        matters. The Court will thereafter issue a formal order defining the exact

8        employment dates for eligible FLSA Collective Action opt-in plaintiffs and

9        Unpaid Wages Class members.

10    Dated this 31st day of January, 2022.

Honorable Raner C. Collins
Senior United States District Judge

- 29 -